UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re ) | |
| ) | |
| ROGER W. SODERSTROM and ) | Case No. 6:11-bk-16036-KSJ |
| TANSEY M. SODERSTROM. ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| ) | |
| | |
| J. THOMPSON INVESTMENTS, LLC and ) | |
| JOAN THOMPSON, ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | Adversary No. 6:12-ap-00028-KSJ |
| ) | |
| ROGER W. SODERSTROM, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Debtor, Roger Soderstrom, who is very prominent in the Central Florida real estate market, and his business partner, Scott Buono, were promoters of a business created to rent executive suites in a prestigious building in downtown Orlando.[1] Plaintiffs, J. Thompson Investments, LLC and Joan Thompson,[2] allege that Soderstrom made fraudulent misrepresentations to induce them to invest $831,000 into this business. I now find that Soderstrom did make these false misrepresentations and will enter a judgment against him for $811,000 that is not dischargeable under § 523(a)(2)(A) of the Bankruptcy Code.[3]

---

[1] At trial, Thompson voluntarily dismissed the Co-Debtor and Defendant Tansey Soderstrom. (Doc. No. 74.)
[2] The Court will refer to the Plaintiffs collectively as "Thompson."
[3] All references to the Bankruptcy Code refer to 11 U.S.C. § 101, *et. seq*.

Soderstrom secured rights to purchase the fifteenth floor of the Plaza building in downtown Orlando (the "Property") at a favorable, pre-construction price in 2004. He intended to use the Property for the business of renting executive suites to professionals (the "Plaza Project"). Soderstrom worked with Buono, who had expertise in running executive suites operations, to form several entities: Plaza N 15 Partners, LLC ("Plaza Partners") to hold Soderstrom's and Buono's investment in the project; Plaza N 15, LLC ("Plaza 15") to own the real estate and take out a bank loan; and SOC-Plaza Suites, LLC, to serve as the tenant and operate the executive suites business.[4] Soderstrom planned to make a $500,000 profit upon selling the Property to Plaza 15, and then continue to earn money from operating the executive suites business.

Soderstrom and Buono arranged financing for Plaza 15's purchase of the Property from Soderstrom with Florida Capital Bank, N.A (the "Bank"). The Bank, however, required a 20% down payment before it would loan the remaining 80%. The purchase price of the Property set by Soderstrom was $5,040,000; thus, Plaza 15 needed $1,260,000 in cash to get the loan. Plaza 15 also needed another $840,000 to complete the build-out of the executive suites and to pay initial operating costs of the business. In total, Plaza 15 needed the Bank loan plus $2.1 million to start the business. To accumulate the necessary capital, Soderstrom and Buono set up Plaza 15's membership structure comprised of Class "A" members and Class "B" members, each with a 50% ownership interest.

Soderstrom and Buono each initially contributed $250,000 to Plaza Partners, although Soderstrom funded his portion with his profit from the sale of the Property to Plaza 15; as he put it, he "left it in the deal."[5] Plaza Partners in turn contributed that $500,000 to Plaza 15 in return

---

[4] *See* Plaza N 15, LLC Entity Chart, Plaintiffs' Exhibit 1.
[5] Trial Tr. at 123.

for the Class "A" membership interest.[6] Soderstrom and Buono planned to solicit the remaining $1.6 million from outside investors to make up the Class "B" membership.[7] The purpose of the Class "B" equity was to fund the remaining gap between the $2.1 million needed and Plaza Partner's initial $500,000 investment.

At first, Soderstrom hoped one investor would provide the entire $1.6 million; however, when the targeted investor backed out at the last minute, Plaza 15 needed money quickly to close the loan from the Bank and to purchase the Property on schedule.[8] Soderstrom agreed to fund an additional $800,000 needed to close the loan, the so-called Interim "B" Investment.[9] To fund this $800,000 Interim "B" Investment, Soderstrom took out a letter of credit for $650,000 and used $150,000 of the remaining profit he made from flipping the property to Plaza 15.[10] So, at the closing of the Bank loan, Soderstrom had committed a total of $1,050,000—$250,000 for Class "A" membership and $800,000 for Class "B" membership.

Because Plaza 15 still needed an additional $800,000, Soderstrom saw an opportunity to recruit more Class "B" investors both to complete the build-out of the space and to fund operating costs but also to allow Soderstrom to recoup his unexpected $800,000 Interim "B" Investment. The first such outside Class "B" investor was David Taylor, who agreed to contribute $400,000.[11] But Taylor would only tender the $400,000 if Soderstrom and Buono

---

[6] Trial Tr. at 122.
[7] Trial Tr. at 121–22.
[8] Trial Tr. at 137–38.
[9] (Trial Tr. at 113, 138–39.) Soderstrom's investment is referred to as the "Interim Class 'B' Contribution" throughout the Subscription Agreement and Operating Agreement.
[10] (Trial Tr. at 118.) Soderstrom did not consistently testify to the amount of money Soderstrom contributed for his Interim "B" Investment. The Court finds this picture the most consistent with the other evidence: Soderstrom put in $650,000 from the letter of credit and $150,000 from his "profit" for his Interim "B" Investment. (*Id.*) He also occasionally included the $250,000 he contributed to Plaza Partners for its "A" investment. (Trial Tr. at 125-26.) Occasionally, it appears Soderstrom may have also included accrued interest on his letter of credit.
[11] *See* David Taylor Subscription Agreement, Plaintiffs' Exhibit 14.

secured another investor so the project would be fully funded.[12] The second Class "B" investor was Thompson, the Plaintiff.

After receiving a $1.5 million inheritance, Thompson was in the market for a safe investment she could carry through to retirement. Thompson knew a real estate agent who worked for Soderstrom's firm, Stirling Sotheby's International Real Estate. When the realtor learned Thompson had cash and was looking for an investment opportunity, the realtor mentioned the Plaza Project and introduced Thompson to Soderstrom. Prior to this introduction, Thompson knew of Soderstrom's excellent reputation as "mover and shaker" in the Central Florida real estate market, but had not social or business relationship with him.

The first and only time Thompson actually met with Soderstrom *prior to investing* was late August 2007. At the meeting, Soderstrom and Buono discussed their plan for the Plaza Project, showed her the unfinished space, and gave Thompson some documents, including an Executive Summary.[13] Thompson alleges Soderstrom said her investment would pay for the completion of construction, building out the office space, and—"all the things they needed to do to finish the floor so that they could start to rent the suites."[14]

Soderstrom flatly and vehemently denies making this statement.[15] This representation, that Thompson's money was needed for completion of the build-out, is the only alleged misrepresentation made by Soderstrom. No third-party witness testified to support either party's allegation. No extraneous evidence clarifies whether the statement was made. In the end, this is a true "he-said-she-said" factual dispute, the determination of which comes down to credibility of testimony. The Court in the end finds Thompson more credible than Soderstrom. Thus, the Court

---

[12] Trial Tr. at 144–45.
[13] Plaintiffs' Exhibit 9.
[14] Trial Tr. at 61; 89-90.
[15] Trial Tr. at 128.

finds Soderstrom represented to Thompson that her investment funds would go towards completing the build-out.

After the meeting, Buono emailed Thompson various investment documents—Plaza 15's Operating Agreement, Thompson's Class "B" Subscription Agreement, and an organization chart for the Plaza Entities.[16] Thompson reviewed the documents and sent them to her attorney for further review.[17] Her attorney sent her an opinion letter explaining his concerns and participated in a conference call with Thompson, her husband, and Buono.[18] After weeks of review and correspondence with Buono, Thompson ultimately agreed to invest $800,000[19] in return for half of the Class "B" membership and a 25% interest in Plaza 15. Thompson's $800,000 investment, the first domino to fall, also brought in Taylor's investment of $400,000.

Notwithstanding Soderstrom's representation that all of Thompson's monies would go to pay construction costs, in reality, between Taylor's $400,000 contribution and Thompson's $800,000 contribution, Plaza 15 only needed $652,000 to complete construction and fund initial operating costs.[20] Indeed, Soderstrom testified that only $212,000 of Taylor's investment and $440,000 of Thompson's investment went to fund construction costs incurred by Plaza 15.[21]

The remaining contributions by Thompson and Taylor went directly and instantaneously back to Soderstrom to repay a large portion of his Interim "B" Investment.[22] The same day the second installment of Thompson's investment credited to Plaza 15's account, Soderstrom and Buono executed a corporate resolution providing for disbursement of $557,900 to Soderstrom

---

[16] Plaintiffs' Exhibit 12.
[17] Trial Tr. at 77.
[18] Defendant's Exhibit 7, 22.
[19] Thompson later invested an additional $31,000 for a Plaza 15 capital call in late 2008. (Trial Tr. at 49; Defendant's Exhibit 24.)
[20] Trial Tr. at 128, 137, 146.
[21] Trial Tr. at 127.
[22] Trial Tr. at 165–68; Plaintiffs' Exhibits 27 & 28.

from the $1.2 million contributed by Thompson and Taylor.[23] This disbursement was made mere days after Thompson made her investment.[24] All told, after the last two investors made their contributions,[25] Soderstrom eventually withdrew over $900,000 as a "repayment" for his initial Class "B" investment, much of it monies contributed by Thompson.[26]

### Count I - § 523(a)(2)(A)

Thompson's first count seeks a nondischargeable judgment for fraud under § 523(a)(2)(A). Thompson bears the burden to prove nondischargeability under § 523(a) by a preponderance of the evidence.[27] "Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud."[28] To prove fraud, the plaintiff must establish, by a preponderance of the evidence, that: (i) the debtor made a false representation with the intent to deceive the creditor; (ii) the creditor relied on the misrepresentation; (iii) the reliance was *justified*; and (iv) the creditor sustained a loss as a result of the misrepresentation.[29]

The first element, that the debtor made a misrepresentation with the intent to deceive the creditor, is often the most difficult to prove. "A determination of fraudulent intent is an issue of fact and 'depends largely upon an assessment of the credibility and demeanor of the debtor.'"[30] Thompson here asserts and the Court finds that Soderstrom made a false representation stating that Thompson's $800,000 investment would be used to complete the build-out, when in fact,

---

[23] (Trial Tr. at 167; Plaintiffs' Exhibit 28) Thompson's investment occurred in two stages: a $440,000 investment on September 25, 2007 followed by a $360,000 wire transfer on September 28, 2007. (Trial Tr. at 163; Plaintiffs' Exhibit 26.)
[24] Trial Tr. at 165-66; Plaintiffs' Exhibit 27.
[25] After Thompson and Taylor made their $1.2 million investments, two other investors rounded out the $1.6 million Class "B" membership by investing $200,000 each. (Plaintiffs' Exhibits 15, 16.)
[26] Trial Tr. at 167-68.
[27] *See Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). *See also* Fed. R. Bankr. P. 4005.
[28] *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998).
[29] *Id*; *See also Field v. Mans,* 516 U.S. 59, 73-75, 116 S. Ct. 437, 445-46, 133 L. Ed. 2d 351 (1995) (holding that Section 523(a)(2)(A) requires justifiable rather than reasonable reliance).
[30] *In re Shamar*, No. 6:11-BK-08748-ABB, 2012 WL 1569565, at *5 (Bankr. M.D. Fla. May 2, 2012) (quoting *Equitable Bank v. Miller (In re Miller),* 39 F.3d 301, 305 (11th Cir. 1994)).

Soderstrom really wanted Thompson's monies to immediately repay himself and to divest himself of any meaningful interest in the Plaza Project. "A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive."[31]

Soderstrom had ample motive to induce Thompson to invest in the Plaza Project. He wanted to cash out and to avoid any risk. He intentionally deceived Thompson, promising that her monies were needed *in full* to complete construction and that he necessarily would continue as an active investor in the business. Thompson relied on Soderstrom's continued financial involvement in the business for assurance that, if he retained monies in the business—so-called "skin in the game"—he likely would work harder for the business to succeed and for all investors, including Thompson, to profit. If Thompson had known the truth, that Soderstrom intended to immediately cash out with her funds, she never would have invested.[32]

In his defense, Soderstrom says that Thompson never could have relied on his continued investment in the business because her Subscription Agreement, which her attorney reviewed, explicitly provided that he could recoup his Interim "B" Investment if Thompson's investment was not needed to complete the build-out. On this point, Soderstrom discounts the gravity of his misrepresentation and how it affected Thompson's interpretation of the Subscription Agreement and Operating Agreement.

The Subscription Agreement provides that Thompson's funds would be used for: (1) "costs and expenses of building out and furnishing" the office space and other start-up expenses, or (2) "*to the extent not necessary for the foregoing*, distributed by [Plaza 15] to Soderstrom as return of the Interim Class B Contribution as provided in the Operating Agreement for the

---

[31] *Id.*
[32] Trial Tr. at 69.

Company."[33] In turn, the Operating Agreement provided a convoluted mechanism for Soderstrom to receive repayment of his Interim Class "B" Investment from future investors.[34] The parties disputed the Operating Agreement's language at trial, but these issues are red herrings.[35] The Subscription Agreement plainly states that Thompson's funds could be distributed to Soderstrom pursuant to the Operating Agreement only "to the extent not necessary" for build-out and start-up costs.[36] Soderstrom misrepresented to Thompson that her funds *were* needed to complete the build-out. Thus, Thompson had no reason to believe these provisions were operative.

Soderstrom also argues he always could have induced other future investors to the Plaza Project that would allow him to recoup his Interim Class "B" Investment. If so, he could have recouped his investment and, down the road, forfeited his interest in the Plaza Project, even if all of the monies invested by Thompson initially were used for construction costs. He was not committed to be an investor in the Plaza Project forever.

But, the fact is, Soderstrom did not need to seek any further investors. He found a willing candidate in Thompson. He told her an untruth, that her monies were needed for the build-out, to allow him to get more capital than needed specifically to allow him to repay himself and walk

---

[33] Plaintiffs' Exhibit 13 (emphasis added).
[34] Section 4.3 of the Operating Agreement states: "Notwithstanding any other provision herein, however, any additional or future Capital Contributions, from the admission of a new Class B Member or otherwise, to the extent not designated by Manager with the approval of the contributing Member and Soderstrom for the payment of any Shortfall or Operating Deficit, shall be distributed to Soderstrom up to the cumulative amount, and as a return, of the Interim Class B Contribution and any additional contributions, Member Loans, or other advances made by Soderstrom, or thereafter the Class A Member, to fund any Shortfall or Operating Deficit. To the extent not expressly transferred Soderstrom shall retain the right to receive all accrued Preferred Return in respect of Class B Member Capital Contributions returned to Soderstrom pursuant to the foregoing provision." (Plaintiffs' Exhibit 17.)
[35] The parties mainly argued over the clause "to the extent not designated by Manager with the approval of the contributing Member and Soderstrom for the payment of any Shortfall or Operating Deficit." (Plaintiffs' Exhibit 17 at ¶ 4.3.) Thompson argued this required her approval—as the contributing member—before the new investment funds could be distributed to Soderstrom. Soderstrom argued the contributing member's approval only applied to the manager's designation that the contribution be used for the payment of any Shortfall or Operating Deficit, not the distribution to Soderstrom.
[36] Plaintiffs' Exhibit 13.

away from the company. The totality of the circumstances leads the Court to conclude Soderstrom made the misrepresentation to Thompson with the intent to deceive.

The next two factors—reliance-in-fact and justifiable reliance—are a bit more nuanced. Reliance-in-fact is satisfied by Thompson's testimony. She testified that she relied on Soderstrom's statement that her funds were needed for the build-out in making her decision to invest the $800,000 into Plaza 15.[37] Further, she testified that because Soderstrom made this statement, she was not concerned about the provisions in the Subscription Agreement and the Plaza 15 Operating Agreement that allowed Soderstrom to receive a refund of his Interim "B" Investment.[38]

The key issue is whether such reliance was justifiable. In *Field v. Mans*, the Supreme Court determined that justifiable reliance—as opposed to reasonable reliance—is the appropriate standard of reliance under a § 523(a)(2)(A) false representation claim.[39] Much of the case law dealing with justifiable reliance discusses when the plaintiff has a duty to investigate a debtor's misrepresentation, or, put differently, when one in the plaintiff's position should have been alerted to the misrepresentation. That is precisely what Soderstrom argues here: considering the provisions in the Subscription Agreement and the Plaza 15 Operating Agreement that allowed Soderstrom to withdraw his Interim "B" Investment from subsequent "B" investors' contributions, and considering Thompson's attorney's warning about the peculiarity of these provisions, Thompson could not have justifiably relied on Soderstrom's statement.

---

[37] Trial Tr. at 61–64.
[38] Trial Tr. at 68–70.
[39] *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995).

Evaluating justification of reliance "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."[40] Under the justifiable reliance standard, a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation."[41] However, one is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."[42] "It is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."[43]

Thompson's attorney, after reviewing the Subscription Agreement and Operating Agreement sent to her, stated in a memorandum sent to Thompson:

> I would also ask the Company why your capital contribution would be distributed to Soderstrom "as a return of the interim Class B contribution to the Company" if the funds are not necessary for working capital or reserves. This seems to contradict the Operating Agreement as to how capital contributions are paid back. If the funds are not necessary for working capital and reserves, then it should be held in your account. Capital contributions used to purchase membership interest should not ordinarily be used to pay back contributions from other members.[44]

Soderstrom argues that Thompson's attorney's statements put her fully on notice that Soderstrom eventually would or could pull his money out of the project. Soderstrom, however, again overlooks the impact of his misrepresentation—to convince Thompson that these

---

[40] *Id.* at 71.
[41] *Id.* at 70.
[42] *Id.*
[43] *In re Vann*, 67 F.3d 277, 283 (11th Cir. 1995)
[44] Defendant's Exhibit 7 at 2.

provisions were not operative because her investment *was* needed for working capital or reserves, i.e., to finish the build-out. Thompson's attorney's statements did not serve to put her on notice that Soderstrom's misrepresentation was false in any way.[45] Her money could not repay his Interim "B" Investment because he specifically and deceitfully told Thompson that her money was needed for business capital.

Although Thompson was technically an "accredited investor,"[46] she did not have any experience investing in real estate and had never before invested in a limited liability company.[47] At the meeting with Soderstrom and Buono, Thompson used her senses and saw an unfinished shell of an office space that needed her money to be completed.[48] Soderstrom does not point to any evidence that should have alerted her to question further about the veracity of Soderstrom's representation or the cost of the build-out. Soderstrom told a well-placed lie to induce Thompson to give him $800,000, primarily to repay himself. Thompson justifiably relied on Soderstrom's false representation.

As to damages, Thompson testified she would not have invested the full $800,000 if she knew her money was going towards "cashing out" Soderstrom.[49] Likewise, she would not have tendered the additional $31,000 in response to the capital call in late 2008. She testified that she relied on his reputation and continued investment in the project in making her decision to invest.[50] The Plaza Project ultimately failed. Soderstrom's representation directly caused Thompson's loss because she would not have invested a dollar but for Soderstrom's false representation.

---

[45] Thompson did have a discussion with Buono and her attorney before investing, but Thompson could not recall the substance of the conversation. (Trial Tr. at 96-97.)
[46] Trial Tr. at 86.
[47] Trial Tr. at 84-85; 52.
[48] Trial Tr. at 60-61.
[49] Trial Tr. at 63-64.
[50] *Id.*

Thompson recently sold her interest in Plaza 15 to Buono for $20,000 but has lost $811,000. The $811,000 loss is directly attributable to Soderstrom's false representations intentionally made to deceive Thompson upon which she justifiably relied.

### Count II - § 523(a)(19)(A)

In addition to the § 523(a)(2)(A) count, Thompson seeks a judgment on one count of securities fraud under Florida Securities Investor Protection Act, § 517.011 et seq. of the Florida Statutes. If entitled to such a judgment, Thompson seeks a determination on nondischargeability § 523(a)(19) of the Bankruptcy Code.[51] Because the Court finds Thompson entitled to a nondischargeable fraud judgment under § 523(a)(2)(A), and the proof required under both subsections are largely the same and provide for the same relief, the Court declines to address any unique issues raised by § 523(a)(19).[52]

### Conclusion

Thompson has proved the elements of § 523(a)(2)(A) by a preponderance of the evidence. Soderstrom misrepresented that Thompson's investment would pay to complete construction on the Plaza Project when his true goal was to use her funds to recoup his initial investment. Thompson's reliance on Soderstrom's misrepresentation was justifiable. Thompson lost $811,000 as a result of Soderstrom's misrepresentation. Soderstrom is liable to Thompson

---

[51] 11 U.S.C. § 523(a)(19) (2014).

[52] Bankruptcy courts are split on whether a bankruptcy court can rely on its own judgment then deem it nondischargeable under § 523(a)(19). Under some courts' view, the section only permits bankruptcy courts to deem nondischargeable a judgment rendered by a *different court* so long as it falls within the requirements laid out by § 523(a)(19)(A). *See, e.g.*, *In re Collier,* 497 B.R. 877, 903 (Bankr. E.D. Ark. 2013); *In re Bundy,* 468 B.R. 916, 922 (Bankr. E.D. Wash. 2012); *In re Pujdak,* 462 B.R. 560, 574 (Bankr. D.S.C. 2011); *In re Jafari,* 401 B.R. 494, 497 (Bankr. D. Colo. 2009). Other courts hold that the plain text of the statute, and judicial efficiency, permits bankruptcy courts to determine liability, damages, and dischargeability of the debt for securities violations and securities fraud. *In re Sato*, 512 B.R. 241, 251 (Bankr. C.D. Cal. 2014); *In re Hill,* 495 B.R. 646, 661 (Bankr. D.N.J. 2013); *In re Jensen–Ames,* 2011 WL 1238929, *8 (Bankr. W.D. Wash. March 30, 2011) (unpublished); *In re Jansma,* 2010 WL 282511, *5 (Bankr. N.D. Ill. Jan. 21, 2010); *In re Chan,* 355 B.R. 494, 505 (Bankr. E.D. Penn. 2006).

for a nondischargeable fraud judgment in the amount of $811,000. A separate Final Judgment shall be entered contemporaneous with these Findings of Fact and Conclusions of Law.

Dated: January 22, 2015.

_____
KAREN S. JENNEMANN
Chief United States Bankruptcy Judge

Tucker Byrd, attorney for Plaintiff, is directed to serve a copy of this Order on interested parties and file a proof of service within 3 days of entry of the Order.